# WESTERN MARYLAND RAILWAY COMPANY

### vs.

## CARRIE G. SHATZER.

*Carrier—Negligence—Person Riding on Pass—Exemption from Liability—Knowledge of Provision.*

In an action by one employed on a "camp car" of a telegraph company against a railroad company, for injuries caused by a jolt or a jar of the car while attached to a freight train of defendant, *held* that the evidence of negligence was sufficient to go to the jury.                                                p. 278

Under Code, art. 5, sec. 9A, a prayer which, while referring to the pleadings, fails to state specifically the points wherein it is claimed that a variance existed, cannot be considered on appeal.                                                          p. 282

A common carrier of passengers cannot exempt itself from liability for its own negligence, or that of its servants, to a passenger for hire.                                          p. 283

A gratuitous passenger is ordinarily entitled to the same care and protection on the part of the carrier as those who pay the regular fare.                                             p. 283

Where a carrier transports the employees of a telegraph company under a special contract, a provision in the contract, exempting the carrier from liability for injuries to such employees caused by its negligence, is valid, but it is not binding on an employee who has no knowledge of the contract.

pp. 283-286

That, while plaintiff was employed as cook on a camp car of a telegraph company, the car was moved by being attached to trains of a railroad company, though showing that plaintiff must have known that some agreement existed between the companies by which the car was moved, does not show that plaintiff necessarily knew that the agreement contained a provision depriving her of the right to sue in case she was injured by the negligence of the railroad company.                      p. 286

On an issue whether plaintiff, employed on a camp car of a telegraph company, which was attached to a train of a railroad company, was chargeable with knowledge of a provision in a pass, issued by the latter company in favor of a foreman of the telegraph company and ten employees, of whom plaintiff was one, exempting the railroad company from liability for personal injuries, *held* that plaintiff's evidence that she did not know of such pass, or of the necessity of a pass, was sufficient to go to the jury.                                                     p. 287

One riding, as an employee of a telegraph company, on a car attached to a freight train, is not entitled to the same extraordinary degree of care on the part of the railroad company as it is bound to exercise towards a traveler on a regular passenger train.                                              p. 288

*Decided January 10th, 1923.*

Appeal from the Circuit Court for Allegany County (Doub, J.).

Action by Carrie G. Shatzer against the Western Maryland Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, Adkins, and Offutt, JJ.

*Walter C. Capper* and *William H. Maynard,* with whom was *Alexander Armstrong* on the brief, for the appellant.

The appellee was merely a licensee upon the freight train, permitted to be there as an employee of the telegraph company in pursuance of the contract between the appellant and the telegraph company. The Supreme Court of the United States has held that circus employees who were being transported upon cars attached to freight train under substantially the same conditions as those involved in this case are not

passengers. *C., R. I. & P. R. R. Co.* v. *Maucher,* 248 U. S. 359. To the same effect, see *Robertson* v. *Old Colony R. R. Co.,* 166 Mass. 525.

It has also been held that the following are not passengers: Express Messengers. *B. & O. S. W. Ry. Co.* v. *Voigt,* 176 U. S. 498; *Long* v. *Lehigh Val. R. R. Co.* (C. C. A., 2nd Circuit), 130 Fed. 873; *C. & N. W. Ry. Co.* v. *O'Brien* (C. C. A., 8th Circuit), 132 Fed. 593. Pullman Porters. *Robinson* v. *B. & O. R. R. Co.,* 237 U. S. 84; *McDermon* v. *So. Pacific R. Co.* (Circuit Court of Mo.), 122 Fed. 669; *Denver, etc., R. R. Co.* v. *Whan,* 3 Colo. 230, 11 L. R. A. (N. S.) 432. Lawyer not employed by the railroad, but traveling upon a pass. *No. Pac. Ry. Co.* v. *Adams,* 48 L. Ed. 513, 192 U. S. 440.

It is plain from the aforegoing authorities, as well as on principle—and there is nothing to the contrary in Maryland—that appellee was not, when she sustained the alleged injuries, a passenger of appellant.

Inasmuch as appellee was not, at the time and place of her injury, a passenger and was being transported only by virtue of the pass offered in evidence in this case, she is bound by the terms of said pass, and cannot recover. It is the settled law of the land that a carrier may contract against its own negligence resulting in injury to express messengers, Pullman porters, etc., though public policy permits no such exemption as to passangers. *Baltimore & Ohio S. W. R. R. Co.* v. *Voigt,* 176 U. S. 498, 44 Law Ed. 560; *Robinson* v. *Baltimore & Ohio R. R. Co.,* 59 Law Ed. 849; *Wells, Fargo & Co.* v. *Taylor,* 65 Law. Ed. 205, and cases cited; *Long* v. *Lehigh Valley R. Co.,* 130 Fed. 870 (C. C. A., 2nd Circuit); *Donovan* v. *P. R. R. Co.,* 120 Fed. 218 (C. C. A., 7th Circuit); *Ten Eyck* v. *Director General et al.,* 267 Fed. 974 (C. C. A., 2nd Circuit). A railway company may divest itself of its status as a common carrier by contract, and thereby relieve itself from liability for negligence. *Santa Fe, etc., R. Co.* v. *Grant Bros. Constr. Co.,* 228 U. S. 177; *McCree* v. *Davis,* 260 Fed. 959, 963.

The appellee used, and was on the train only by virtue of,. the pass, and was therefore bound by its terms. *Boering* v. *Chesapeake Beach Ry. Co.,* 193 U. S. 442; *Wells* v. *N. Y. C. R. Co.,* 24 N. Y. 181; *Quimby* v. *B. & M. R. R. Co.,* 150 Mass. 365, 5 L. R. A. 946; *Muldoon* v. *Seattle City R. Co.,* 10 Wash. 311, 45 Am. St. Rep. 787; *Rogers* v. *Kennebec S. S. Co.,* 86 Me. 261, 25 L. R. A. 491; *Harmon* v. *Jensen,*. 176 Fed. 519.

Appellee enjoyed the benefits and was on the train only by virtue of an agreement between the Western Union Telegraph Company and Western Maryland Railway Company, and she is, therefore, bound by the provision of that agreement, whereby the railway company was saved harmless and indemnified against damages from injuries to employees of the telegraph company while being carried free over the railroad under said agreement. *Clough* v. *Grand Trunk Western Railway Co.,* 155 Fed. 81; *Robertson* v. *Old Colony R. R. Co.,* 156 Fed. Mass, 525; *Cleveland, C. C. & St. Paul Ry. Co.* v. *Henry* (Ind.), 83 N. E. 710; *Kelly* v. *Grand Trunk Western Railway Co.* (Ind. App.), 93 N. E. 616; *McCree* v. *Davis,* 280 Fed. 959.

*William C. Walsh* and *Ellsworth R. Roulette,* with whom was *C. Walter Baker* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment obtained against the appellant by the appellee for injuries sustained by her by reason of the alleged negligence of the railroad company. The only bill of exceptions in the record presents the rulings of the lower court on the prayers, three of which were offered by the plaintiff (appellee), and granted, and twenty-five were offered by the defendant (appellant) the first, second, third,. fourth, fifth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth and eighteenth of which were rejected and the others were granted.

The appellee was employed as a cook by the Western Union Telegraph Company and was injured on October 25th, 1920, while she was riding in one of three camp cars of the telegraph company, consisting of a tool car, a dining car and kitchen, and a sleeping and office car, which were being taken from Hagerstown to Big Pool Station, and were attached to the rear of a freight train of the appellant, which included thirty-five cars, besides the caboose. When the train reached the station called Charlton, it was stopped for a short time and, as it was starting, there was, according to the plaintiff's evidence, a very severe jolt. There were on the camp cars the plaintiff, her husband, who was employed by the telegraph company and aided his wife in cooking 'for the hands, and three other employees of that company. She testified that she was thrown with great violence on the stove in the kitchen, her husband was thrown to the floor and his head cut in two places; that the table was thrown against the kitchen door, the dishes were strewn on the floor, and several chairs were upset in the dining car; that two windows were thrown on the floor, and the frame and glass were broken, a large plate glass window being broken into small pieces.

W. H. Small was in what he called the "lobby," which is a part of the sleeping car, and he said the jolt threw him back on the floor; that another man was thrown on the top of a table in there, the table was upset, and he went over the top of the other man; that the table was fastened down with wood screws, and the jar drew them out, upset the table and broke the legs off. Without giving further details as to the jolt, or crash, as some of the witnesses spoke of it, there is ample evidence to show that it was very severe, and the plaintiff was injured. It is said on the part of the defense that the brakes on the telegraph cars were different from those on the freight cars, but however that may be, on the question of negligence there was sufficient to go to the jury, if the defendant was liable, as there is no satisfactory explanation of what caused the conditions shown, if the train was properly handled. The evidence of the engineer and conductor tended to

show that there was no unusual jolt or jar of the freight train observed by them, but they did not testify to, or deny, the damage spoken of.

An agreement was entered into on the 21st of September, 1892, between the Western Union Telegraph Company and the Western Maryland Railroad Company. It recites that the parties jointly owned the line of poles along the railroad from Baltimore to Hagerstown and Williamsport, and that the railroad company owned lines of poles between points named in the agreement, including those from Williamsport to Cherry Run, and the telegraph company owned the wires upon said poles. It was agreed that all of the lines and poles should be sold to the telegraph company as therein provided. A supplemental agreement was entered into on December 8th, 1915, which also continued in force the former agreement referred to and shows, amongst other things, that the appellant is the successor of the Western Maryland Railroad Company, which accounts for the use of the words "railroad" in the agreement, and "railway" in this suit.

The agreement of 1892 provides that "the railroad company agrees to transport free of charge over its railroads, upon application of the superintendent or other officer of the telegraph company, all persons in the employ of the telegraph company when traveling on the business of said company," etc. There is also this provision in it: "It is a condition of this contract that the railroad company is not to be responsible for and the telegraph company hereby covenants and agrees to save the railroad company harmless and indemnify it against any loss or damages of any kind arising from any injury to persons in the employ of, or property belonging to the telegraph company, while being carried free over said railroads under this agreement," etc.

The record shows that, in accordance with the agreement between the two companies, passes were given, and it was customary to issue them to a foreman and ten men. The plaintiff at first stated she never used a pass before the accident, but later, after she was shown two identification cards

from Deerfield to Baltimore, and from Baltimore to Deerfield, signed by E. P. Tottman, assistant plant superintendent, she acknowledged her handwriting on them. She said that Mr. Reechert, timekeeper on the cars, gave her the identification slips; that when the conductor on the passenger train came around, she handed him the pass and the slip. She was asked: "Did he give you back the pass?" and replied, "No, sir, I did not have any pass. Mr. Gibson or Mr. Small—I believe Mr. Gibson—carried the pass, and the conductor handed the pass back to him, I think." She said Mr. Gibson was one of the employees of the Western Union, and he carried the pass that passed her to Baltimore; that she came back with him and he used the pass coming back. She also said that three days before the accident she went from a point close to Baltimore to Asbestos, on a passenger train, and that she traveled on a pass reading, "For foreman and ten men," with the same slips. She said on that trip she left on Saturday, came back Sunday, and was injured on Monday. She further said that, when she handed the conductor the pass, he gave it back to her and, on the return trip, she handed it to the conductor and he gave it back to her again, retaining the identification slips; that Mr. Reechert gave her that pass when he gave her the slips, and when she got back from the trip she gave it to Mr. Reechert. This appears in her testimony: "Q. Now, at the time you made this trip from Asbestos did you read the pass?—the front part? A. Yes, I did, I suppose, in a general way. Q. What did it say, in general terms? A. I really could not say. Q. Did it say pass foreman and ten men? A. Yes, sir. Q. What was on the back of the pass? A. I really could not tell you. Q. Was there anything printed on the back of the pass at all? A. Yes; there was some printing on the back of the pass, but I can't recall at the present time what it was. Q. Didn't the pass read that the company would not be liable to any person traveling on that pass for negligence resulting in injury, or in any event whatever? A. I don't know about that. I can't recall what was on that pass."

She said that she did not pay any fare for any trips made during the time she was employed, while riding in passenger cars, or in camp cars. W. H. Small, who was on the camp cars at the time of the accident, testified that he carried a pass which said on its face, "For one foreman and ten men, when accompanied by a letter of identification." He said he thought that pass covered the transportation of the five people from Hagerstown to Big Pool—"Only it wasn't called for"; that there was not any fare paid, and he had in his possession the pass reading on the front, "Foreman and ten men." He was shown a paper which purported to be a copy of the front of a pass issued in 1920, and said it was a correct copy of the front of the pass he held on the occasion that Mrs. Shatzer traveled from Hagerstown to Big Pool—reading, "One foreman and ten helpers, when accompanied by letter signed by W. P. Tottman, district plant superintendent, Western Union Telegraph Company. All stations." He also said that the copy she traveled on to Baltimore had on the back of it:

> "Western Maryland Railway Company. Leased and Operated Lines. Unless otherwise restricted on its face, this pass is good over all divisions of the Western Maryland Railway until December 31, 1920. Conditions: * * * The person accepting and using this pass assumes all risk of accident or injury to person and all damage to or loss of property, whether caused by negligence of the company's servants or otherwise. As a condition precedent to the issue and use of this pass, the recipient represents that he or she is not prohibited by federal or state laws from receiving free transportation, and that this pass will be lawfully used. I accept the foregoing conditions and subscribe to the statements therein.
>
> . . . . . . . . . . . . . . . . . .
>
> "This pass will not be honored unless signed in ink or indelible pencil by the person or persons to whom issued."

It was proven that the copy offered in evidence was a correct one, and such as used in 1920, and that, in accordance with their custom, the passes for 1920 were destroyed when those for the new year were issued. Harry Uhler testified that he lived in Hagerstown, and was foreman of the Western Union, and that he had one individual pass for "H. Uhler and ten men," and two other passes for a "foreman and ten men." He said he did not go on the camp cars on the day of the accident, but there was a man on there named Small, who had a pass for a "foreman and ten men." He said that would include women employed by the Western Union.

The plaintiff testified in answer to the question, "Did Mr. Uhler have a pass that covered your transportation?" "Not in the camp cars," and when asked, "Did you travel on a pass at all?" she said: "If I traveled on the Western Maryland train there was a pass provided for me, but on the camp cars hauled by the Western Maryland engines there was no pass given to me." She said she had made several trips in the camp cars before the accident, that they were moved quite often to different places, and she was on the cars all the time when they were moved, and when asked, "Well, you were moving practically all the time from the time you were employed, from the 8th day of September until the time you were injured?" she said: "Well, the cars were moved occasionally, but not every day." She said that when those cars were moved they were always hauled by freight trains—on the rear end of the freight train. She was asked: "What arrangement was made about paying your fare when you made these different trips?" and replied: "Mr. Uhler said all who were traveling in the cars, were traveling with the cars."

There was a variance between the declaration and the evidence, as it is alleged that there was a collision, etc., which, under our former practice, would have been important, but chapter 110 of the Acts of 1914, now section 9A of article 5 of 3rd vol. of Code, prevents us from passing on it. The first prayer of the defendant refers to the pleadings, but it

does not state specifically the points wherein it is claimed that a variance existed. *Fulton Bg. Co.* v. *Stichel,* 135 Md. 542; *Rasst* v. *Morris, Ibid.,* 243, 256.·

This State is in line with the great weight of authority in this country, that a common carrier of passengers cannot exempt itself from liability to a passenger for hire from its own negligence, or that of its servants. In *Amer. Casualty Ins. Co.'s case,* 82 Md. 535, 576, CHIEF JUDGE McSHERRY adopted for this Court a summary of the conclusions reached by the Supreme Court of the United States in *N. Y. Cent. R. R. Co.* v. *Lockwood,* 17 Wall. 357, which he thus stated: "First: That a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law. Secondly: That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants. Thirdly: That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter." In what is one of our latest decisions on the subject, *Smith* v. *North. Cent. R. Co.,* 119 Md. 481, 483, JUDGE URNER said: "The averments for each count of the declaration clearly place the plaintiff in the position of a gratuitous passenger at the time of the injury for which he sues. It is not disputed that such a passenger is ordinarily entitled to the same care and protection on the part of the carrier as those who pay the regular fare. This principle is settled in this State by the case of *Abell* v. *Western Md. R. R. Co.,* 63 Md. 433, and has generally been adopted in other jurisdictions."

But when such an agreement has been entered into between a common carrier and another corporation, such as we have shown above exists between the railroad company and the telegraph company, and an employee of the latter company is injured by the alleged negligence of the servants of the railroad company, the right of the employee to recover for injuries sustained by such negligence presents another question. The decided weight of authority is to the effect that

such an agreement is valid between the two companies, but there is a difference of opinion between them as to whether an employee who has not ratified the agreement, become a party to, or assented to it, is precluded from suing for injuries thus sustained. Even if the appellee is not bound by the agreement in this case, whether she is by the pass spoken of must also be considered. In 10 *C. J.* 721, it is said: "Where a carrier transports the employees of others, under special contracts with the employer, a condition in such contract exempting the carrier from liability for injuries caused by its negligence to such employees is valid; and where the employee assents to or ratifies such contract, as by voluntarily contracting with his employer to release the employer and the carrier from liability for such injuries, he is, in the absence of statute to the contrary, bound thereby and cannot recover from the carrier. * * * But where the employee has no knowledge of the contract made by his employer limiting the carrier's liability as to such employee, he is not bound thereby." As to the first part of that statement, the case of *Denver & R. G. R. Co.* v. *Whan,* 39 Colo. 230, 12 Ann. Cas. 732, and note, are cited. That case was decided on the principle that it was not a part of the duties of a railroad company as a common carrier to haul a sleeping car, and an employee of a sleeping car company was not a passenger of the railroad company. In the note in Ann. Cas., it is stated that as a general rule the holding of the principal case was sustained, and the author of that note cited *Chicago, R. I. & P. R. Co.* v. *Hamler,* 215 Ill. 525, 3 Ann. Cas. 42; *McDermon* v. *South. Pac. R. Co.,* 122 Fed. 669; *N. Y. Cent. R. Co.* v. *Difendaffer,* 125 Fed. 893; *Donovan* v. *Pennsylvania Co.,* 120 Fed. 215, 61 L. R. A. 140; *Russell* v. *Pittsburgh, C. C. & St. L. R. Co.,* 157 Ind. 305.

In both the principal case and the authorities cited, the employees had entered into contracts releasing the railroad company from all liability. In the *Whan case* the Court relied on *Balto. & O. S. W. Ry. Co.* v. *Voigt,* 176 U. S. 498, which is one of and perhaps the leading case on the subject.

That agreement was between the railroad company and an express company, but Voigt also entered into a contract by which he agreed to indemnify the express company and also to release the railroad company, and expressly ratified the agreement between the two companies.  In *Hamler's case, supra,* the same principle was announced and many cases cited.  In *Chig., R. I. & P. R. Co.* v. *Maucher,* 248 U. S. 359, the railway company and Barnum and Bailey, circus proprietors, entered into a contract by which the railway company gave them the right to use its tracks and locomotives to haul the circus train.  The agreement provided that the railway company should not be liable for negligence and that agreement was sustained.  But there, Maucher, the employee, had also agreed to release the railroad company.  It was there said that the plaintiff was not a passenger.  In *Robinson* v. *Balto. & O. R. Co.,* 237 U. S. 84, Robinson was a porter on a sleeping car.  The principle was again recognized, but Robinson had also agreed to exempt the railroad company.  In *Santa Fe P. & P. R. Co.* v. *Grant Bros. Cons. Co.,* 228 U. S. 177, MR. JUSTICE HUGHES said: "It is the established doctrine of this Court that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation," citing 17 Wall. 357 and other cases.  But he went on to say: "Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. * * * It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things whose carriage in other circumstances might be within its public obligation."  Citing *Voight's case, supra;* *North. Pac. R. Co.* v. *Adams,* 192 U. S. 440; *Long* v. *Lehigh Valley R. Co.,* 65 C. C. A. 354, 130 Fed. 870.  It will be observed that in those cases the employee had ratified or in some way assented to the agreement.

It seems clear that the great weight of authority holds that between the railroad company and an express company, cir-

cus proprietors, and sleeping car companies, valid agreements can be entered into exempting the railroad company from liability for negligence, but whether employees are bound by them depends upon circumstances in the particular cases. Coming now to the effect of passes with such condition on them as in this case, it may be well to say in the beginning that drovers' passes or contracts are put on a different basis by a good many authorities, which sustain the exemption as to express companies, circuses and sleeping car companies. In 10 *C. J.* 724, in referring to this particular subject, it is said: "By the weight of authority, however, the contract of shipment and the pass are to be construed as a single contract, the consideration for which is the charge made for the transportation of the stock, or the service rendered in caring for the stock, and the drover is deemed a passenger for hire, and therefore a stipulation in the pass or contract purporting to exempt the carrier from liability for negligence is void, as against public policy." A great many cases are cited in the note. In *Western Md. R. Co.* v. *Shirk* (Mr. Shirk being a drover in charge of stock), 95 Md. 637, we held that "The deceased was a passenger. 5 *Am. and Eng. Enc. L.,* 2nd ed., 508, and note 5. He was not, however, entitled to the same absolute and extraordinary degree of care as to his safety which a common carrier is bound to exercise towards a traveler on a regular passenger train." The plaintiff was riding in one of the cars of the telegraph company, in the discharge of her duties as cook, and as she testified that since she had been employed, about six weeks before the accident, the camp cars had been moved from place to place, being attached to freight trains, she must have known that some arrangement existed between the two companies by which those cars were thus moved, but we do not think that she necessarily knew that the agreement between them contained a provision that would deprive her of the right to sue in case she was injured by the negligence of the defendant. It seems to us that the better reasoned cases for the most part decline to adopt the theory that an employee is bound to such an extent as that,

without having agreed upon the arrangement. There was ample evidence to show that she knew, or ought to have known, that she was traveling on a pass or under some arrangement by which she was not required to pay fare, but whether she thus assumed all risk of accident or injury, whether caused by the negligence of the company's servants or otherwise, is another matter.

While it is difficult to believe that she did not know that a pass was required or was being used covering her transportation, as seen above she testified that she did not, and as it is shown that no pass was actually used in the sense of showing it to the conductor on the trip she was injured, and was not even called for, it is possible that she may have thought that the pass, such as she admitted she had seen on her trip to Baltimore and return, was only for use on passenger trains, and that the carriage of the camp cars and the employees in them was by some other arrangement between the two companies, without depriving an employee of the right to hold the railroad company responsible for the negligence of its servants. There is no evidence that a pass was either demanded or presented on the occasion of this accident, or at any other time in the camp cars after the plaintiff entered the employ of the company. The conductor said, "I didn't ask for any transportation. From past experience I knew that they carried transportation." He said he could not say how many men or women employees there were on those three camp cars, and it was possible, if he didn't demand to see the pass, that there might have been more than it provided for. The plaintiff said that no identification card, such as were required on passenger trains, were ever given to her on the camp cars, but we do not regard that as of much force, as on the camp cars there would not be the same occasion for identification cards as on the passenger trains. It does seem that it would have been difficult for a jury to find under the evidence in favor of the plaintiff as to the necessity of a pass on the camp cars, but there was enough in her evidence to require that to be submitted to the jury, which seemed to ac-

cept her statement. That was an important fact, and, as will be seen, most of the opinions, especially in the Supreme Court, laid emphasis on the fact that the employee had entered into an agreement, or in some way gave his assent to the agreement between the two companies as to the exemption from liability.

There is a class of cases which hold that the carrier is not a common carrier when carrying employees of the other corporation under such contracts, as we have seen above. They proceed on the theory that the railroad company is not bound as a common carrier to carry pullman cars, circus trains, etc., and hence did so in those cases as a private carrier, and is not responsible to the extent that a common carrier is in law. But under such agreements as were between these two companies, it would be difficult to adopt that theory. The fact is that some of the terms of those agreements make it difficult to distinguish between the drovers' cases and this one, on the question of whether the plaintiff was not a passenger for hire, but we do not deem it necessary to discuss that question.

As the plaintiff was riding behind a freight train, under *Shirk's case* she was not "entitled to the same absolute and extraordinary degree of care as to her safety, which a common carrier is bound to exercise towards a traveler on the regular passenger trains," and it will be seen that by the plaintiff's first prayer the jury was only instructed that it was the duty of the defendant "to exercise due care and caution for the safety of the plaintiff." The defendant's twenty-fifth prayer went as far as the defendant could properly ask. By that the jury was instructed that if they believed the plaintiff knew or under all the circumstances ought to have known, by the use of ordinary care and diligence, that she was being carried upon the day of her injury, upon said car under the pass offered in evidence, then their verdict must be for the defendant. That was granted. The plaintiff by her first and second prayers took upon herself a greater burden than the defendant's twenty-fifth prayer required, and upon the whole we do not think there was any reversible error in granting

them. The plaintiff's third was the usual prayer as to damages. The defendant's first and second prayers, which sought to take the case from the jury, were properly rejected. There was sufficient evidence of negligence to make it necessary to submit the question to the jury, even if the plaintiff was not a passenger, but was on the car with the consent of the defendant, as she undoubtedly was, unless, of course, the jury found she had bound herself by the pass referred to above. She was not a trespasser, and was entitled to at least due care, unless she was precluded from recovery by reason of her knowledge of the pass, which, under the evidence, was a question of fact for the jury. Nor do we think that there was such contributory negligence on the part of the plaintiff as would have authorized the court to declare as a matter of law she was guilty of it, and hence the third prayer was properly rejected. From what we have said above, it will be seen that the fourth and fifth prayers were properly rejected.

Without prolonging this opinion further by discussing them, we find no reversible error in the thirteenth, fourteenth, fifteenth, sixteenth, seventeenth and eighteenth prayers, as ruled on by the lower court. As all of the other prayers offered by the defendant were granted, the judgment must be affirmed.

> *Judgment affirmed, the appellant to pay the*
> *costs.*