# CHARLES C. FULTON BUILDING CO.

## *vs.*

## CHARLES STICHEL.

*Review on Appeal—Variance—Stairway in Office Building—Injury to Visitor—Contributory Negligence.*

Under Act of 1914, Ch. 110 (Code, Vol. 3, Art. 5, Sec. 9A), the question of variance between the pleadings and evidence cannot be considered as having been raised by any prayer or instruction below which does not specifically state the points wherein it is claimed that such variance exists.          p. 544

An owner of an office or other building, in which he rents rooms to various tenants, keeping control of the hallway, stairway and elevators, while under an obligation to use reasonable diligence to keep the portions so under his control in a safe condition and free from improper obstructions, is not liable for dangers that are obvious, or are as well known to the person injured as to himself.          p. 544

In an action against the owner of an office building for injuries caused by plaintiff's hand becoming impaled, while he was descending a stairway, upon one of a series of spikes fastened on the top of an iron meshwork located above the railing of the stairway, *held* that the spike being perfectly visible to plaintiff, had he looked, and there being no necessity that he should have placed his hand in proximity thereto, recovery was barred by his negligence.          pp. 545-549

One of ordinary intelligence, with unimpaired sight, cannot avoid the defense of contributory negligence by saying that he did not see an object which, if he had used his senses, he in the nature of things must have seen.          p. 549

*Decided January 14th, 1920.*

Appeal from the Baltimore City Court (SOPER, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*William S. Thomas,* for the appellant.

*Morris W. Rosenfeld,* with whom were *Harry B. Wolf* and *Webster S. Blades* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued the appellant for injuries alleged to have been received by him in going down a stairway of an office building in Baltimore City belonging to the appellant. The trial resulted in a verdict for the plaintiff (appellee), and this is an appeal from a judgment entered thereon. The trial Court granted the defendant's fourth, fifth, sixth and seventh, and refused its first, second, third and eighth prayers. The rulings on those rejected prayers are presented by the only bill of exceptions. The first prayer sought to have the jury instructed that there was no evidence legally sufficient under the pleadings to show any negligence on the part of the defendant, the second that there was no evidence legally sufficient to entitle the plaintiff to recover and the third that the plaintiff had been guilty of such negligence contributory to his injury as would preclude his recovery.

There are two counts in the *narr.,* in each of which the negligence relied on is, that "while the plaintiff herein was lawfully and carefully descending the public stairway in said building with his hand on the rail or banister, his hand became impaled upon a spike or pointed piece of metal; that the defendant knew, or in the exercise of ordinary care ought to have known, of the existence of said spike and that said spike was likely to impale the hands of persons having occasion rightfully to use said stairway." As we understand the

evidence, there might have been some question as to whether there was not such a variance between the proof and the allegation of negligence in the *narr.* as would have been, under the former practice, a fatal variance under the first prayer. The allegation that while the plaintiff was descending the public stairway "with his hand on the rail or banister, his hand became impaled," etc., indicates that the spike was on the rail on which his hand was, in descending the stairs, but the evidence shows that it was not on the rail or banister when the plaintiff was injured. But under the Act of 1914, Chapter 110 (Sec. 9-A of Art. 5, 3rd Vol. of Code), the fact that a prayer, which refers in general terms to the pleadings, was granted or refused shall not be sufficient to show that the point or question of a variance between the pleadings and the evidence was tried and decided in the Court below, as required by Section 9; "and the question of such variance shall not be considered as having been raised by any prayer or instruction below, unless such prayer or instruction shall state specifically the points wherein it is claimed that such variance exists." We are, therefore, not at liberty to consider that variance, if it be conceded to exist. Section 91A of Article 75 (3rd Vol. of Code) does not relieve that difficulty. *Rasst* v. *Morris, ante* p. 243.

We can, then, only pass on the legal sufficiency of the evidence to show negligence on the part of the defendant, and the question of the alleged contributory negligence on the part of the plaintiff. We do not understand the appellant to deny that an owner of an office or other building, in which he rents rooms to various tenants, but keeps control of the hallway, stairway, elevators, or any part of the building not rented to tenants is "under an obligation to use reasonable diligence to keep the portions, so retained under his control, of the building in a safe condition and free from improper obstructions," as stated in *Whitcomb* v. *Mason,* 102 Md. 275, 282. The rule as to the owner's responsibility is well stated in 20 *R. C. L.* 55, par. 51, cited by the appellee, and there

are numerous cases in the note from .English, Federal (including the Supreme Court) and State courts. It is there said: "The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils." See also 18 *Am. & Eng. Enc. of Law*, 245; 24 *Cyc.* 1125-1126; 16 *R. C. L.* 1071, par. 591. In 20 *R. C. L.* 56, par. 52, the "Basis of duty to persons going on premises" is considered, and it is there said: ."The mere ownership of land or buildings does not render one liable for injuries sustained by persons who have entered thereon or therein; the owner is not an insurer of such persons, even when he has invited them to enter. Nor is there any presumption of negligence on the part of an owner or occupier merely upon a showing that an injury has been sustained by one while rightfully upon the premises. The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted * * *. And hence there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant."

It will be well to first ascertain what the record discloses as to the actual condition of the stairway and banister, so as to determine whether the danger there, if any, was obvious, and whether the plaintiff contributed to his injury by the want of due care on his part. He testified that the stairway was well lighted—"plenty of light," as he repeated several times. There is no evidence tending to show that there is anything unusual in the construction of the stairway, or the iron mesh on the banister, and the accident occurred in the

middle of the day—between twelve and one o'clock. Unfortunately, the witnesses referred in their evidence to points, as from "here" to "there," or in some way which was not always explained in the record, but some pictures taken of the *locus in quo,* which were admitted to be correct, and some measurements testified to help us to better understand what the witnesses were speaking of. The stairway between the third and second stories is divided into two flights, with a small platform, apparently of the width of the stairway, and being probably about three feet square, judging from the pictures and measurements given, at the bottom of the first flight, coming down. On the first flight, coming down from the third story, there is a banister, and under that some ornamental work. At the bottom of that flight, near the end of the banister, there is a post, and then, at what appears from the pictures to be at right angles, the second flight (counting from the third story) of that stairway goes down from the platform mentioned above. There is a rail from that post going down the second flight of the stairs, but on that rail there is fastened an iron mesh work. The bottom of that mesh work is on that rail, but on the top of it there is a rail which runs parallel with the platform, and hence the mesh work increases in height as it goes down the stairway. On the rail at the top of the mesh work upright spikes are fastened, which are about five inches high (above the rail), and about as thick at the top as a pencil, being a little thicker below. The rail to which the mesh work is fastened is five inches above another rail, on top of the ornamental work, which runs along the second flight of stairs.

According to the measurements of Mr. Rich, the superintendent of the defendant's building, which are not contradicted in any essential particular, if a man is standing on the last step of the first flight (from the third floor) with his hand on the banister, as shown on a picture in evidence, his hand is fourteen inches diagonally from the top of the first spike. Then if he steps down to the platform, "he stands

against the post before he takes the first step down," accord-
ing to Mr. Rich's statement. From the center of that post
diagonally up to the top of the first spike is twelve inches.
From the platform to a line drawn parallel to it from the
top of the first spike is forty-four inches. The "treads" of
the steps (as they are spoken of in the record, but evidently
meaning "risers") are seven and one-half inches, and hence
the first step of the second flight (coming down) is fifty-one
and one-half inches from the top of the first spike and the
second step is, according to that measurement, fifty-nine
inches (the witness said fifty-eight) below the top of that
spike, but to one side of it. From that step any one going
down stairs would have to reach backwards in order to get
hold of the top of the spike.

Keeping these distances, etc., in mind let us see what the
plaintiff himself testified to in reference to the accident. He
said the elevators were crowded, and he started to walk down
from the fourth floor of the building, where he had gone to
have corrected an accident insurance policy which he had
taken out a few days before. The mistake was corrected, he
left the office of the insurance agent and started down the
stairway. He said: "I got hold of the banister and walked
down the steps from the fourth floor to the third, and then
from the third to the second is another banister, clear banis-
ter. I did not know just what the banister was like, I do
now. But it was a clear banister, from the third going down,
half a flight, and then there is a little turn, and that part is
clear, so I keeps on going down, looking where I was walk-
ing, and first thing I know I was about two steps down when
I could not get any further, and I looked up so, and saw my
hand through that spike, and I said, 'Good Lord, what is
that?' I took my hand off, and the blood spurted." He was
asked by his attorney: "You say it went in there so quickly
you did not feel it?" and replied: "I did not know it, I did
not even feel it. I did not know it. I could not go any
further. I just taken about two steps down from that re-

cess, and my hand was up high and could not get any further, and I looked up and I see the thing jammed through my hand, and the skin, it was raised right up, went right through the skin." He said, in answer to a question by the Court, that he had one foot on the second step and one on the third, and could not get any further.

The pictures, which both sides rely on and are conceded to be correct, show that it was impossible for the plaintiff to have been injured in the way he said he was, if he had been using due care. They show that the top of the spike was above the level of the end of the banister on the first flight, was also above the level of the post where the turn was made, and the rail on the top of the mesh work was somewhat higher than the post—the spike being five inches higher than that. The iron mesh work was there, perfectly visible, and while he could not grasp the rail on which that mesh work rested, as he said he did the banister on the first flight, he could have placed his hand on it as the picture shows Mr. Rich did, when he had one foot on the platform and the other on the first step going down the second flight. There was not only plenty of light there, as the plaintiff testified, but there is no suggestion that his sight was in any way affected, or that his sense of feeling was different from that of other people. If he had used his eyes, as he went down the first flight and was approaching the post where the turn was made, he could have seen the spikes—the first one being only fourteen inches from where his hand would be on the banister, and all of the rest being in line with the first one—the rail they were fastened to being parallel with the platform and not with the banister. It is not stated how many spikes there were, but ten of them are shown in the pictures, and as the plaintiff came down the first flight (from the third floor to the platform) he could not have failed to see them, or the mesh under them, if his eyes were open, and he used ordinary care. The platform was just in front of him and the post was near the end of the banister which he used

in going down the first flight, and any one of ordinary intelligence must have known that there was a turn there, and that the spikes and mesh were on the right side of the next (second) flight of stairs. The picture shows that he could have seen, through the mesh work, the top steps on the second flight. When he turned to go down the second flight he had to raise his hand above the height of the post, in order to get it on the top rail of the mesh work, and then had to raise it five inches higher to get it on top of the spike. How he could have his hand on top of the spike, with it running into his hand, without at least knowing that his hand was on something other than a banister or rail he does not attempt to explain, and no reasonable explanation can be given, but he went on down to the second and third steps, which caused his hand to be up and back of him, and he says he did not know what the trouble was until he found *he was hooked on the spike and could get no further.* If he had no feeling in his hand, he must have known it was caught by something, and yet, according to his evidence, he continued to go down to the second and third steps, and the probabilities are that he was going fast, as otherwise he would have stopped before he did. It was impossible for the accident to have occurred as he said it did, if he was using due care, and the third prayer should have been granted. If we accept his own version, as to his hand being caught, there was especial reason for him to look and see what was there. He says he did not see any spike, but according to the principles announced by the authorities in this State, as well as elsewhere, as there is nothing to show that his sight is impaired, or he was not a man of ordinary intelligence, he cannot avoid the effect of his contributory negligence by saying he did not see an object which, if he had used his senses, he in the nature of things must have seen, and he cannot be credited when he says he did not see it. *Helm's Case,* 84 Md. 515, 526; *Md. Elec. Ry. Co.* v. *Beasley,* 117 Md. 270, 279; *Sullivan* v. *Smith,* 123 Md. 546, 556; *Mayor, etc., of Baltimore* v. *Bas-*

*sett,* 132 Md. 427, 431, and many other cases to same effect. If he did not use his senses for his protection, as he should have done, he was guilty of negligence. He said that it was the first time that he had gone down the steps and hence, it is argued, he was not aware of the danger, but while he may not have been called upon to anticipate danger of injury, in using steps with which he was not familiar, he was at least required to see what other persons must have seen, if they used ordinary care.

Under the law applicable to this class of cases and the facts shown by the record, we are by no means satisfied that there was any evidence of negligence on the part of the defendant legally sufficient to entitle the plaintiff to recover, but as we have reached the conclusion that he cannot recover by reason of his own negligence, even if it be conceded that there was some evidence of negligence on the part of the defendant, and that the third prayer should have been granted, it is not necessary to say more as to the first and second prayers, or to discuss the eighth. It follows that the judgment must be reversed, and as there can be no recovery, it would be useless to award a new trial.

> *Judgment reversed, without awarding a new trial, the appellee to pay the costs.*