STATE OF MARYLAND, for Use of
PUMPHREY v. MANOR REAL ESTATE
& TRUST CO. et al.

No. 5899.

United States Court of Appeals
Fourth Circuit.

Argued June 27, 1949.

Decided August 2, 1949.

I. Duke Avnet and Edgar Paul Boyko, Baltimore, Md., for appellant.

J. Gilbert Prendergast and Walter V. Harrison, Baltimore, Md. (Bernard J. Flynn, U. S. Atty., James B. Murphy, Asst. U. S. Atty., and Roszel C. Thomsen, Baltimore, Md., on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is a suit under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., and the Maryland Wrongful Death statute, Code Md.1939, art. 67, § 1 et seq., brought in behalf of the widow of Evered W. Anderson to recover damages for his death. The defendants are Manor Real Estate and Trust Company, a holding company affiliated with the Pennsylvania Railroad Company, Calvert Village, Inc., and the United States of America. The complaint charged that Anderson died of endemic typhus, a disease transmitted by means of the bite of a flea from an infected rat, which in this case was caused by the negligence of the defendants in failing to take adequate measures to exterminate the rats on the premises of an aggregation of apartment houses in which Anderson was a tenant. The District Judge dismissed the complaint, holding that although negligence was proved, the evidence did not sufficiently establish that Anderson's death was caused thereby. He also held that there could be no recovery because endemic typhus is a comparatively rare and unknown disease, and Anderson's death from the disease was not a foreseeable consequence of the defendant's negligence.

The house in which Anderson lived was one of twenty-two three-story row dwellings, one hundred and twenty-five years old, located in the 600 and 700 blocks of North Calvert Street in Baltimore City. The Railroad Company purchased them more than thirty years ago as a site for a freight terminal, but the project was abandoned and most of the houses, including No. 619 in which Anderson lived, had been vacant for many years. In June, 1943, they were leased to the Federal Public Housing Authority for a nominal rental to aid the government in the pressing need for housing for defense workers in the Baltimore area during the war. The government divided each of the houses into six apartments, so that the 600 block contained a total of ninety-six dwelling units, and actually housed as many as three hundred and twenty-eight persons. All of the occupants had access to the basements or cellars where they did their laundry and deposited their garbage in containers furnished by the landlord. The houses were heated by furnaces in the basement, one for each group of four houses. In several of the buildings openings were cut between adjoining cellars.

The Public Housing Authority engaged a Baltimore real estate firm, Pierre C. Dugan & Nephew, to manage the premises, and they remained in charge from 1943 to 1947 when the Authority subleased the apartments to Ellis B. Mazer who in turn assigned them to Calvert Village, Inc. During the period of government control the wooden floors of the cellars were honeycombed with rat burrows and the garbage from the apartments frequently overflowed the delapidated uncovered containers furnished by the landlord to the tenants, and spilled upon the floor. Only one janitor and a helper were employed to service the more than twenty houses in the 600 and 700 blocks; the helper worked full time but the janitor was present only three or four hours a day in the winter, spending the rest of his time on other work for the

Dugan firm. As a result of this deplorable situation, many large and bold rats, often four or five at a time, were observed in the cellars each time the tenants descended to dispose of their garbage and trash. Mrs. Anderson and the tenants generally complained to the agent, but to no avail.

This was the condition of the premises when Anderson rented the second floor front apartment in No. 619 in February, 1946. He was taken ill with typhus on January 13, and died on January 23, 1947. The incubation period for endemic typhus is from four to twenty-two days. There is no evidence and no contention that Anderson was exposed to the disease at any other place than the cellar of the house on which his apartment was located, where he disposed of his garbage daily, and occasionally stayed long enough to make some efforts to clean up the refuse on the floor.

The negligence of the managers of the project consisted of providing inadequate janitor service and taking inadequate steps to eliminate the rats in the cellars. The danger of rat infestation, as a result of the rotted floors and holes in the masonry, was first called to the attention of the government by the Baltimore City Health authorities on March 15, 1944. The Department did not take affirmative action because the property was in control of the United States Government. However, in October, 1946, two cases of typhus in the 600 block of Calvert Street were reported to the Department and the director of the sanitary section, thoroughly alarmed, communicated this fact to the United States Public Health Office; and on November 1, 1946, a representative of the United States Public Health Service, a representative of the city Health Department, and the field supervisor of the Housing Authority had a conference concerning the rat infestation in the Calvert Street properties, the danger of typhus, and the effect of rats in carrying the disease. On November 4, 1946, the city Health Department started to trap rats in the area in order to determine the incidence of typhus infection, and 18 per cent. of the rats in the two blocks were found to be infected. It was also found that the disease was localized in that area.

As a result of this conference, the United States Public Health Service recommended that the rat holes in the cellars be filled, the rat burrows dusted with D. D. T. and rat poison, and the doors and windows be made secure so that the rats could not enter from the outside. Dugan delegated the job of carrying out these recommendations to two men who had been working three days a week on odd jobs in the Calvert Street property and who, in the period from November, 1946, to January, 1947, devoted their spare time during three days a week in carrying out the recommendations. They had never done ratproofing work before, and they did not fill the rat holes satisfactorily. A city Health Department inspector was forced to mark with chalk the holes missed by the workmen who went over the ground a second time, but even then did not fill all the holes that were marked. The United States Public Health officer did not recommend that the floors of the cellars be concreted, or that the masonry walls in the cellars be repaired, and it followed that the rats still had harborage in the floors and walls, and were able to dig new holes as fast as the old holes were filled.

A total of six cases of typhus was reported to the city Health Department from the apartment house area prior to January 1, 1947. On that date the government subleased the premises to Mazer who in turn assigned his interest to Calvert Village, Inc. The withdrawal of the property from government control freed the city Health Department to take charge of the situation and on January 20, after a conference with Mazer, it issued a detailed directive outlining the necessary steps for effective ratproofing. The work was done in about two months in accordance with the directive by Calvert Village, Inc. at a cost of about $8,000 and no cases of typhus have been reported from the area since that time.

■ The suit was virtually abandoned by the plaintiff as to the Manor Real Estate and Trust Company, and was accordingly dismissed by the District Court. With a few exceptions, the houses were not occupied for many years prior to the government occupation and the evidence

showed that rats congregate only where there is available food. Manor was relieved from all liability for the condition of the property in its contract of lease with the Housing Authority.

■ The case was likewise properly dismissed as to Calvert Village, Inc., which was chartered on January 3, 1947, and took over Mazer's sublease on January 10, 1947. No person connected with the corporation had any knowledge of the existence of typhus or rat infestation in the properties until the city Health Department took control and directed the extermination of the rats. It would have been impossible to make the necessary repairs and improvements to correct the situation between January 4th, when Calvert first received notice of the infestation, and January 9th, the last day on which Anderson could have contracted the disease. It follows that Calvert cannot be held liable. See Thompson v. Clemens, 96 Md. 196, 209, 53 A. 919, 60 L.R.A. 580. The same is true of Mazer whom the plaintiff unsuccessfully sought to join as a party defendant on October 5, 1948, more than one year after Anderson's death.

■■ The dismissal of the complaint as to the Housing Authority, however, cannot be sustained. The Authority transformed the sixteen houses in the 600 block into a large number of apartments, agreed to supply the tenants with heat, furnished containers in the cellars, one for each house, for the reception of garbage, and provided janitor service. There can be no question under these circumstances as to the responsibility of the Housing Authority for the condition of the basements, and its liability for the consequences of its neglect. It is true that there was no covenant on its part in the lease in this case to keep the property in repair, and that under the law of Maryland the general doctrine is that there is no implied covenant requiring the landlord to make repairs, and no implied warranty that the house shall be fit for habitation; but the landlord's obligations are different in the case of multiple unit dwellings for "where he leases separate portions of the same building to differ-

ent tenants, and reserves under his control the halls, stairways, and other portions of the building used in common by all of the tenants as means of access to their respective rooms or apartments, he is under an obligation to use reasonable diligence to keep the portions so retained under his control of the building in a safe condition and free from improper obstructions. * * * This obligation of the landlord to the tenants of different parts of the same building in reference to the halls, stairways, doors, etc., of which he has kept possession for their common use, has been held not to result from the implied covenant for quiet enjoyment incident to the leases of the several portions of the building, but to be of the same character as that of any other owner of real estate, who permits or invites others to use it for a particular purpose, to keep it safe for those using it within the scope of the invitation. Gillvon v. Reilly, supra [50 N.J.L. 26, 11 A. 481]; Looney v. McLean, supra [129 Mass. 33, 37 Am.Rep. 295]; Vanderbeck v. Hendry, supra [34 N.J.L. 467, 471–472]; Camp v. Wood, 76 N.Y. 92, 32 Am.Rep. 282." Whitcomb v. Mason, 102 Md. 275, 282–283, 62 A. 749, 751, 4 L.R.A.,N.S., 565. See also, Smith v. Walsh, 92 Md. 518, 531–532, 48 A. 92, 51 L.R.A. 772; Fulton Building Co. v. Stitchel, 135 Md. 542, 544–545, 109 A. 434; 32 Am.Jur., Landlord & Tenant, § 688.

The judge held that the Authority was negligent in failing to make the repairs to rid the cellars of the rats and in failing to furnish sufficient janitor service to keep the garbage in covered receptacles outside the houses until removed by the city, and that this negligence contributed to Anderson's death. He said: "We do not believe it can be said with certainty that Anderson would not have contracted the typhus, from which he died, had it not been for the negligent omissions of the defendants." * * * "We are satisfied that such negligence, either or both phases of it, contributed to Anderson contracting endemic typhus fever in house No. 619." * * * "In all likelihood neither any typhus infected rats nor any fleas infected by them would have been there after November,

1946, if the Government had properly carried out the remedial measures prescribed by the City authorities, because, as shown by the report of the City Health Department's sanitarians, within a few weeks after the City stepped in and took control, with the infection at its peak, the infestation ended and no other cases of endemic typhus have ever been known to occur in these premises. However, the particular flea or rat, or both, that caused the fatality, might have survived all proper remedial measures. Therefore, mere surmise or speculation is not enough to impose liability for negligence under such circumstances. There must be actual proof, by the weight of the credible evidence, that but for such negligence, Anderson would not have contracted the typhus fever from which he died."

██ This pronouncement is obviously correct insofar as it holds that the government's negligence was in all probability the efficient cause of Anderson's death; but the final conclusion that the government must be relieved from liability because of the possibility that the death-bearing rat might have survived all efforts to eliminate it cannot be upheld. It is true that a defendant's liability for negligence may not be based upon mere surmise or speculation, but it is equally true that findings based upon a preponderance of evidence may not be avoided by indulging in mere conjecture. The plaintiff in a negligence case is not bound to prove his charge beyond all doubt, or even beyond all reasonable doubt; it is sufficient if a preponderance of the evidence sustains his claim. In the language of the Restatement of Torts, § 432 Comment c, if the actor's negligence, either of act or omission, results in harm of the sort from which the duty was designed to protect the other, his negligence may be regarded as a substantial factor in bringing about the harm in spite of the fact that the same harm might possibly have been sustained had the actor not been negligent. In order to prevent the actor's negligent conduct from being a substantial factor, it must clearly appear that the required precautions would have proved unavailing or that the harm would have been sustained even had the negligent act not been done." See also, A.L.I. Model Code of Evidence, Rules 1(3), (5). Sullivan v. Nesbit, 97 Conn. 474, 117 A. 502; Murphy v. Waterhouse, 113 Cal. 467, 45 P. 866, 54 Am.St.Rep. 365; Livanovitch v. Livanovitch, 99 Vt. 327, 131 A. 799.

Nor can the government be relieved from liability on the ground that it could not reasonably foresee that death from a disease which is relatively rare would have resulted from its negligence. The evidence establishes conclusively that the field supervisor of the Public Housing Authority, who inspected the premises monthly, was notified on November 1, 1946, when Anderson's life might still have been saved by prompt action, not merely of the danger of rat infestation in general, but also of the presence of endemic typhus on the premises, and of the particular role which rats play in spreading the disease. It is clear, therefore, that the defendant failed to act in spite of foreknowledge of the very danger which ultimately occurred. Cf. Sloan v. Edwards, 61 Md. 89.

██ The defendant also contends that recovery must be denied because the deceased assumed the risk of injury when he remained in the apartment after he discovered that the cellars were overrun with rats. Reliance is placed upon such decisions as Thompson v. Clemens, 96 Md. 196, 53 A. 919, 60 L.R.A. 580, where it was held that a landlord who has agreed to make repairs to leased premises, which are not apparently urgent and who has no reason to suppose a serious injury will result from his failure to make them, is not liable to respond in damages for personal injuries sustained by the tenant in consequence of the failure to repair; and that the tenant of such a landlord who is aware that the leased premises are in dangerous condition and chooses to remain on the premises and suffers an injury from the defect, would ordinarily be guilty of contributory negligence, barring recovery. That ruling, however, is not pertinent in this case. The Andersons were not entirely free to leave the premises because of the difficulty of obtaining living accommodations in 1946 which the Authority's enterprise on North

Calvert Street was designed to alleviate. Moreover, there is no evidence that the Andersons were aware of the danger of typhus infection from the rat infested premises, but on the contrary there was positive evidence that Mrs. Anderson was not aware of this risk until her husband was taken sick. The tenants were entitled to exercise the right of occupancy conferred by their lease and to demand that the landlord perform the duty of keeping the reserved portion of the premises in safe condition for their use. Under these circumstances, there was no assumption of the risk on their part. See, Restatement of Torts, § 893.

The defendant also contends that it is relieved from liability under the Federal Tort Claims Act, 28 U.S.C.A. § 1314(b), because the jurisdiction of the District Courts to entertain actions on claims against the United States for injury to property of persons is limited by the statute to negligent or wrongful acts or omissions of an employee of the government acting within the scope of his employment, and an employee is defined in 28 U.S.C.A. § 2671 as a person acting on behalf of the federal agency in an official capacity. It is said that Dugan was in complete charge of the management of the property as an independent contractor and hence Anderson's death was not caused by the negligent act or omission of any employee of the government. There is no substance in this contention because the evidence shows that Dugan was subject to the detailed supervision of the Public Housing Authority, and that in his contract for the management of the property he agreed to be bound by the regulations issued by the government in the form of a contract managers' manual, and by all amendments thereto.

It is also claimed that the Federal Claims Act does not apply because it is provided by Section 2680 of the Judicial Code, 28 U.S.C.A., that Section 1346(b) shall not apply to any claim based upon the exercise or performance of a discretionery function or duty on the part of a federal agency or an employee of the government. The answer to the contention is found in the language of Section 2680 itself because in this case the evidence shows that the government was not charged with a discretionary function or duty, but with the absolute duty of keeping the premises safe for the tenants.

The judgment of the District Court is affirmed except as to the United States of America, and as to it the judgment is reversed and the case is remanded to the District Court with directions to assess the plaintiff's damages.

Affirmed in part, reversed in part, and remanded.