SEGERMAN *v.* JONES, INDIVIDUALLY, ETC.

[No. 102, September Term, 1969.]

*Decided December 9, 1969.*

*Motion for rehearing filed January 6, 1970; withdrawn by Counsel January 12, 1970.*

The cause was argued before BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*William H. Clarke* for appellant.

*Amicus Curiae* briefs filed by Maryland State Teachers' Association, Inc. (*Walter S. Levin, Donald Lee Noble* and *Sauerwein, Boyd & Decker,* on the brief); Board of Education of Montgomery County (*Robert S. Bourbon* and *Dunphy & Bourbon* on the brief); and Montgomery County Education Association, Inc. (*Victor L. Crawford* on the brief).

*Joseph Montedonico,* with whom were *Edward C. Donahue, William A. Ehrmantraut* and *James P. Gleason* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

In 1968, Mary Latane Jones was a member of Mrs. Rita Segerman's fourth grade class at the Rollingwood Elementary School in Montgomery County. On 10 January of that year, Mrs. Segerman left the classroom for a few minutes on school business [1] while the class was engaged in a program of calisthenics. During the teacher's absence and while the exercises were being performed, the back of Mary's head was struck by the feet of a fellow pupil, Robert Glaser (Bobby), and two of her front teeth were badly chipped. Mary's father, as Mary's next friend and in his individual capacity, brought suit against Mrs. Segerman and Bobby, alleging that Mary's injuries were the result of their negligence. Both defendants filed general issue pleas and the case went to trial before the Circuit Court for Montgomery County without a jury. At the end of the plain-

---

1. One of the ironies of the case is that Mrs. Segerman had gone to the principal's office, 40 feet from the classroom, to examine Bobby Glaser's record.

tiff's case, Bobby's motion for a directed verdict in his favor was granted, and judgment was entered in his favor for costs.[2] From judgments against Mrs. Segerman entered on verdicts in amounts of $5,000.00 in Mary's favor and $1,131.00 in favor of Mary's father, Mrs. Segerman has appealed.

We shall undertake to summarize such parts of the testimony as are pertinent to the issue before us. Mrs. Segerman, A.B. Syracuse University, M.A. New York University, had taught school in Oceanside, New York for an unspecified period of time and in Montgomery County for five years prior to the accident. She had been a teacher at Rollingwood for a year and a half, and had taught the fourth grade class since September, 1967.

The following are relevant excerpts, respectively, from the "Program of Studies" and from "Grades K-6, Physical Education, Course of Study" issued to teachers in the public schools of Montgomery County, which were introduced below:

> "Every elementary school child participates daily in a program of directed physical education activities during which time the teaching of skills, techniques, attitudes, and understandings is stressed. The minimum instructional period is 150 minutes per week. The program is developed and implemented through the cooperative efforts of classroom and physical education teachers. Children participate in active and quiet games, individual and team games, tumbling and apparatus work, self-testing activities, and rhythmic activities."
>
> * * *
>
> "Indoor areas for physical education may include an all-purpose room, a regular classroom, or an empty classroom * * *."

---

2. No cross-appeal was taken by the plaintiff from the entry of this judgment, but Mrs. Segerman assigns error in granting it as one of the grounds of her appeal.

There were 30 children in Mrs. Segerman's class at Rollingwood. The classroom was 32 feet long, with an additional three feet used as a cloakroom, and 25 feet wide. The room contained 30 moveable desks, each 17½ by 23½ inches, and 30 chairs which slid under the desks. There were also in the room a work table, three feet by six feet; two bookcases, 11 by 28 inches; a teacher's desk, 29½ by 53½ inches, and a chair which slid under the desk.

Mrs. Segerman testified that the physical education teacher came to Rollingwood on Fridays; that on other days, "It's up to the individual teacher to carry on her own phys. ed. program," and that since September, 1967, she had conducted exercise programs for Mary's class in the classroom. She also said that the members of her fourth grade class had been doing push-ups, sit-downs and jumping-jacks in the physical education class but that push-ups had never been previously done in her classroom, although jumping-jacks had.

According to Mrs. Segerman, the day when the accident occurred was in "a snowy week." She remembered "the entire week as being an indoor week", when "[t]he children could not go outdoors for phys. ed. during any part of that week at all."

Mrs. Segerman said that on 9 January, she asked the class if they were familiar with a record called "Chicken Fat" [3] and when "so many of the children knew the record * * * asked them to bring it in." Margaret Wydro, a physical education teacher assigned to the Rollingwood area, described the record:

> "I think it was about five years ago. It was written specifically for the President's Council on Youth Fitness, to implement the program that President Kennedy had started. It was

---

3. Admitted in evidence was Capitol Record No. CF-1000, "Chicken Fat," "The Youth Fitness Song", one side of which was school version LB-738; the other, disc jockey version LB-739, composed by Meredith Willson and narrated by Robert Preston. The disc jockey version plays for 2 minutes, 12 seconds; the school version, for 6 minutes, 30 seconds.

written by Meredith Willson, sung by Robert Preston; published by Capitol Records as a service to the Junior Chamber of Commerce, who was hopefully trying to distribute it at no cost to all schools throughout the country."

Four children brought the record to class. At about 11 o'clock on 10 January, Mrs. Segerman played the record. As Mrs. Segerman recounted it:

"Q. Is that the record that you played that day? A. That is it.

"Q. Mrs. Segerman, before playing this record that day that this girl in the class had brought in, did you go over it with the class? A. Yes.

"Q. What did you do? How did you do it? A. First of all I asked, before I played the record, whether all the children knew it. And no one raised their hand to say that they did not know it. And I said we would listen to it first to make sure that we all knew how to do the exercises.

"Q. Were they at the time sitting down; standing up? A. No. They were sitting down in their seats. I had not done anything. I just wanted them to listen to it first.

\* \* \*

"So we all were in our seats listening to the record. After the record played I asked the children then was there anyone who did not know how to do any of the exercises. And no one raised their hand. So to the best of my knowledge they all were aware of the exercises.

"Q. Have they done all of these same exercises in gym class that you had seen? A. Yes.

"Q. All right. A. At that time, at that point I took the children and placed them around the room.

"Q. How did you place the children around the room? A. Generally as close to their desks

as possible, or as close to this place they were supposed to be sitting; however, of course with the arrangement it would necessitate my moving certain children because the desks were close together, so that I utilized aisles and whatever space on the sides and front and back of the room that I had.

"Q. Do you know now just where you placed the children on that day? A. I could not place thirty of them if I had to.

"We could reconstruct it with the children, if we called the same children back again, I'm sure.

"Q. I mean do you know now? A. Not thirty of them, no.

"Q. Generally what would you do with respect to children that were on the same aisle, as these people would be sitting here, and these people would be there. That would give you six in an aisle. A. The normal procedure would be to place the children arms' distance apart, which is what I actually did.

"THE COURT: Place them what?

"A. Arms' distance apart.

"In other words, you have the child put their arm out, and the next child does that.

"After a while you get to judge the distance. You know approximately what is a safe distance between the children. And this is what I did with the group.

"Q. So you would take some people, instead of standing them by their seats, and move them in different places? A. Yes, definitely.

"Q. So you did this before you played the record the second time? A. Yes; oh, certainly.

"Q. Now, before you played the record the second time, did you say anything to the children there? A. Yes.

"Q. What did you tell them? A. First I made sure, as I said, that we all knew what was expected of them. I told them not to move from where I had placed them, that I was going into the office to attend to something and that I would be back in a few minutes and that they were to follow the instructions on the record.

"Q. Did you tell them not to move? A. Definitely.

\* \* \*

"Q. Then what did you do when you put the record on? A. I waited to see how the procedure was going, and I stayed for a few minutes to make sure that there was sufficient room and that things were going well.

"Q. The few minutes that you were there, did everything go all right? A. Yes."

Mrs. Segerman then left the classroom and walked across the hall to the principal's office. On cross-examination, she said she assumed she was out of the classroom "four or five minutes."

What happened next is told by Mary:

"Mrs. Segerman put on a record, 'Chicken Fat'; and she told us to follow the record. And we'd started doing, working, and we went through the first side of the record. And then when we were starting the second side, Mrs. Segerman, I think she told us that she's going out of the room, I'm almost positive she did, and she left. And — and Bobby Glaser was in the back of the room, and he moved up because he couldn't hear the record player. And he was doing his push-ups, but he brought up his legs and was resting on his knees. And when he brought his feet down they went over the back of my head and they came down on the floor.

"Q. What came down on the floor? A. My head.

"Q. Your head? A. And hit, my teeth hit the floor and they came out.

"Q. Your teeth came out? A. Yes."

Mary admitted that the class had been told not to move from their places, but did not remember that the children had been spaced about the classroom. Bobby Glaser did not testify, but Susan Turmala, another member of the class, said Bobby's "knees bent and his feet went up towards the ceiling."

Mrs. Segerman described the record as "perky," as "a very catchy beat." Perhaps the record can more informatively be described by saying that it is in 4/4 time, much like that of "Seventy-six Trombones" from "The Music Man" for which Willson composed the music. There follows a sample of Preston's recitative which calls for the exercises:

"Touchdown, every morning — ten times, not
   just now and then. Give that chicken fat back
   to the chicken and don't be chicken again.
   No, don't be chicken again.
Push up, every morning—ten times.
Push up, starting low
Once more, on the rise.
Nuts to the flabby guys
Go, you chicken fat, go away.
Go, you chicken fat, go.
Good morning!
Hands on hips—place.
Now then, touch your toes with me
Ready, touch down
Up everybody—up, down
Ten times, not just now and then.
      (Counting from one through ten in back-
                        ground)
One, two, three, four, five, six, seven, eight, nine,
   ten—up.
Give that chicken fat back to the chicken and
   don't be chicken again.

No, don't be chicken again. No, don't be chicken
   again.
Halt.
Hit the dirt—hit!
Push-ups next. Nice and steady, not too fast.
Ready. Push up—down—every morning. Ten
   times.
Push up (push), starting low; starting low
Feet down (down), that's fine, on the rise
                  (chorus echoing words)
Nix to the flabby guys
Go you chicken fat go, go away.
Go, you chicken fat, go. (down—up—down)"

Based on the testimony, the lower court found the fol-
lowing facts:

"1. The infant plaintiff and the infant defen-
dant were about nine years old on January 10,
1968, when the occurrence complained of took
place in Classroom No. 12 of the Rollingwood
School, at which time the defendant, Rita Seg-
erman, was employed by the County Board of
Education as a schoolteacher and charged with
the proper supervision of the infant plaintiff
and the infant defendant.

"2. The occurrence took place while thirty
children were doing calisthenics in Room 12
which measured 25 feet by 35 feet—which room
—less three feet for closet space — contained
thirty pupils' desks and other furniture.

"3. The calisthenics were ordered by the de-
fendant, Rita Segerman, to be done in accor-
dance with the instructions on a phonograph
record known as Chicken Fat; the record re-
quired toe touch, push-ups, sit-ups, torso twists,
pogo springs, jumping jacks, march in place,
arm circles, bicycle ride, deep breathing and run
in place, all to be done in fast time.

"4. The infant plaintiff and the infant defen-

dant had not heard the record prior to January 10, 1968.

"5. The infant plaintiff sustained her injuries when the infant defendant kicked her head while they were doing push-ups.

"6. The type of calisthenics called for in Chicken Fat were customarily done in the All Purpose room or outdoors, and always under the supervision of a teacher.

"7. The All Purpose room measures 69 feet by 48 feet and could have been used for the calisthenics; nor was there a logical reason why the children could not have been taken outdoors.

"8. The defendant, Rita Segerman, well knew that the infant defendant had a propensity to disobey instructions, and to be active and that he required more supervision than the other children to the extent that her concern for the child caused her to recommend that he be evaluated by a psychologist."

We cannot say that the court's finding of facts in Nos. 1 through 7 was clearly erroneous, Maryland Rule 886 a, although there was a conflict in testimony as to whether Mary and Bobby had heard "Chicken Fat" before, and Mrs. Segerman's testimony that the accident occurred during "an indoor week" and that the all-purpose room was not available at 11 o'clock because it was being set up for use as a lunch room beginning at 12 o'clock was uncontroverted.

The only testimony which would support finding No. 8 appeared in Mrs. Segerman's pre-trial deposition, which was read at the trial:

"Q You had recommended Bobby Glaser for psychological study?

\* \* \*

"A Yes.

"Q And would you mind telling us why you made the recommendation?

"A Yes. I felt he is a young boy with a complex personality that needed help beyond my professional capacity.

\* \* \*

"Q How would you describe Bobby Glaser as far as his over-all physical activities in class?

"A Physical activities in class?

"Q Yes. Is he overly active, average, quiet, or how would you describe it?

"A He is a physically active boy.

"Q Would you say very physically active as far as other boys in the class?

"A He is an excellent athlete. I mark his report card accordingly.

\* \* \*

"Q Would you say that Bobby Glaser required more supervision than other students in your room?

\* \* \*

"A Yes, I would."

On cross examination, this was expanded:

"Q Prior to January 10th of '68, have you had more problems with Bobby Glaser than the average student in this particular class, than any of the other students in there?

"A May I say I had a fairly difficult class? There were many students that concerned me in the class.

\* \* \*

"Q Has Bobby Glaser ever disobeyed any of your instructions prior to that, that you gave him or the class, prior to January of 1968?

\* \* \*

"A On occasion.

\* \* \*

"Q Did you in fact have disciplinary problems with him?

* * *

"A Minor problems."

On further cross examination, Mrs. Segerman explained the affirmative answer which she had given on deposition to the question, "Would you say Bobby Glaser required more supervision than other students in your room?" by saying, "I think he needs academic supervision more than the average child. If he means my physical presence there more than the average child, I would say no."

The most significant item of all, however, is that the record shows that it was made clear on cross-examination that it was not until *after* the accident that Mrs. Segerman recommended that Bobby be psychologically evaluated. It is for these reasons that we think that finding No. 8 was clearly erroneous.

Findings Nos. 9 and 10 purport to resolve mixed questions of law and fact, combining facts which would properly be found by the trier of facts under appropriate instructions propounded by the court relating to negligence and proximate cause.

"9. At the time of the occurrence she [Mrs. Segerman] knew, or should have known, that unless properly supervised a child in the group of thirty might injure himself or another because of the type of the calisthenics required by the record in the room that was overcrowded for such activity.

"10. She left the room for four or five minutes while the children were doing calisthenics to the record and thereby negligently failed to supervise the children and that her negligence and failure to supervise the children was without any contributory negligence on the part of the infant plaintiff, was the proximate cause of the infant plaintiff's injuries."

It would appear that the court found that Mrs. Segerman was negligent in leaving the classroom and that her failure to supervise the exercises was the proximate cause of Mary's injury. For reasons which we shall develop, it is our view that Mrs. Segerman's motion for a directed verdict should have been granted on the issue of proximate cause, which while ordinarily a question for the trier of facts, was here a question of law, because the facts were undisputed and admitted of but one inference. *Sacks v. Pleasant,* 253 Md. 40, 251 A. 2d 858 (1969); *Farley v. Yerman,* 231 Md. 444, 190 A. 2d 773 (1963); *Jubb v. Ford,* 221 Md. 507, 157 A. 2d 422 (1960).

In structuring her appeal, Mrs. Segerman poses six questions: [4]

"1. Whether or not a teacher was negligent in leaving her class room for four or five minutes on school business.

"2. Whether the absence of the teacher from the class room was the proximate cause of the plaintiff's injuries.

"3. Whether or not a teacher is immune from suit while acting within the scope of her employment.

"4. Whether or not the Court committed error in failing to grant the defendant's motion for a directed verdict or directed finding at the close of the plaintiff's case, and in failing to grant the defendant's motion for a directed verdict and to make a finding in behalf of the defendant, at the close of all of the evidence.

"5. Whether or not the Court committed error in granting the defendant Robert Glaser's motion for a directed verdict or directed finding at the end of the plaintiff's case.

"6. Whether or not the Court committed er-

---

4. *Amicus curiae* briefs filed in behalf of Board of Education of Montgomery County, Maryland State Teachers' Association, Inc., and Montgomery County Education Association, Inc., are addressed primarily to questions 1, 2 and 3.

ror in finding against the defendant in favor of the plaintiff."

As we see the case, the significant issues are those presented by the second and fourth questions, because we believe that Mrs. Segerman's absence was not, as a matter of law, the proximate cause of Mary's injury. Even if we assume for the purposes of this opinion that Mrs. Segerman was negligent in leaving the room, it cannot be said that her absence or failure to supervise caused the injury, because Mrs. Segerman's presence could not have prevented it, and liability could be imposed only if the injury was reasonably foreseeable. "This is one of those events which could occur equally as well in the presence of the teacher as during her absence." *Ohman v. Board of Education*, 300 N. Y. 306, 310, 90 N.E.2d 474, 475, *aff'g* 275 A. D. 840, 88 N.Y.S.2d 273 (1949). As a consequence, we need not reach the other questions raised by the appeal.

In our view the proximate cause of Mary's injury was an intervening and wholly unforeseen force — the fact that Bobby Glaser left his assigned place and did not do his push-ups as he had been instructed to do them.

The subject of teacher liability has been dealt with in Annotation, 32 A.L.R.2d 1163, 1181 (1953) and in at least three articles: Paul O. Proehl, *Tort Liability of Teachers*, 12 Vand. L.Rev. 723 (1959) ; Vernon X. Miller, *Personal Injury Litigation in School Cases*, 20 Law and Contemp. Probl. 60 (1955) ; and Reynolds C. Seitz, *Legal Responsibility Under Tort Law of School Personnel and School Districts as Regards Negligent Conduct Toward Pupils*, 15 Hastings L.J. 495 (1964). See also, 78 C.J.S., *Schools and School Districts* § 238 c (1952) at 1197.

Professor Proehl points out that the great majority of teacher negligence cases have arisen in jurisdictions where by statute, the plaintiff is given a direct right of action against the school governing unit[5] or alterna-

5. California, see Cal. Gov't Code § 900 et seq. (1966) and Cal. Educ. Code § 1013 (1969) ; New York City, N.Y. Educ. Law § 2560 (1953) ; Washington, Wash. Rev. Code § 4.08.120 (1953).

tively in jurisdictions where the teacher is saved harmless [6] and points up the distinction that while the teacher may stand *in loco parentis* as regards the enforcement of authority, a teacher does not stand *in loco parentis* with regard to negligent acts, for the teacher (unless immunity can be claimed) is liable for the negligent injury of a child, while a parent is not. 1 Harper and James, *The Law of Torts* § 3.20 (1956) at 291; see also, *Gaincott v. Davis*, 281 Mich. 515, 519, 275 N. W. 229, 231 (1937).

It is interesting to note that in the New York and California cases, attention is focused primarily on the school district, and in some of the cases, the allegedly negligent teacher may not even be joined as a defendant. On occasion, strict application of principles of negligence law may quite properly be tempered by the social desiderata which undoubtedly evoked the statutes. For example,

> "Parents do not send their children to school to be returned to them maimed because of the absence of proper supervision or the abandonment of supervision"

which appeared in a dissenting opinion in *Ohman v. Board of Education, supra*, 300 N.Y. 306, 311, where recovery was denied because of lack of proximate cause, was cited with approval in *Feuerstein v. Board of Education*, 202 N.Y.S.2d 524 (Sup. Ct. N.Y. 1960), *aff'd* 13 A.D.2d 503, 214 N.Y.S.2d 654 (1961), where recovery was allowed in a case where a frail pupil suffered heart damage as a result of being assigned the job of carrying heavy boxes of school supplies and cited again in the opinion filed below in this case. It is not authority for the proposition that a teacher can be held to the strict accountability of an insurer of the safety of her pupils,

---

6. Connecticut, Conn. Gen. Stat. Ann. § 10-235 (1958); New Jersey, N. J. Stat. Ann. § 18 A: 60-4 (1968); N. Y. Educ. Law § 3023 (1969-1970 Supp.) (school districts with fewer than one million inhabitants).

since she is held only to the standard of the reasonable care exercised by a person of ordinary prudence. *Luna v. Needles Elementary School Dist.,* 154 Cal. App. 2d 803, 316 P. 2d 773 (D.C.A. Calif. 1957). But see Restatement, *Torts* 2d § 320 (1965) at 130 and particularly Comment d. at 131.

Professor Proehl states the rule of the cases:

"Broadly speaking, what is reasonable and what is foreseeable are the criteria in supervising classes. The standard is again one of 'ordinary prudence.' The impossible will not be required, although, as teachers know, it is often asked. Where supervision could not have prevented the injury, its lack will of course not be held to be the cause of the injury [Wilber v. City of Binghamton, 296 N. Y. 950, 73 N.E.2d 263 (1947)—Teacher's answering telephone was not proximate cause of injury to child by stone batted by another]. What is foreseeable as likely to happen in the classroom if the teacher steps out for a moment is a matter of the wildest conjecture, and it is perhaps not unreasonable to say that a teacher who thus omits her duty of supervision might foresee physical injury as a consequence. The injury through horseplay of one pupil by another in the teacher's brief absence may perhaps be treated as the unforeseen act of a third party [*Ohman v. Board of Education, supra,* 300 N. Y. 306], but where the absence was prolonged and the omisson was gross, however, as in the failure entirely to supervise a lunchroom where such supervision was required not only by prudence but by statute, the plaintiff recovered for a broken arm received in a scuffle [Forgnone v. Salvador Union Elementary School Dist. 41 Cal.App.2d 423, 106 P. 2d 932 (D.C.A. Calif. 1940)]." 12 Vand. L. Rev. at 742-43.

We regard this case as being controlled by the cases where the plaintiff sought to impose liability on the theory that the negligence which caused the injury was the absence of the teacher from the classroom. In *Ohman v. Board of Education, supra,* 300 N. Y. 306, a 13 year old plaintiff was injured when he was struck in the eye by a lead pencil thrown by another pupil. At the time of the accident, the teacher was in a supply room within 50 feet of the classroom. The testimony was in conflict as to whether the teacher had been gone "more than an hour" or "less than a minute."

In affirming the dismissal of the complaint, the New York Court of Appeals said:

> "By such standards [long established and well recognized rules of common-law negligence], a teacher may be charged only with reasonable care such as a parent of ordinary prudence would exercise under comparable circumstances. Proper supervision depends largely on the circumstances attending the event but so far as the cases indicate, there has been no departure from the usual rules of negligence."
>
> * * *
>
> "This is one of those events which could occur equally as well in the presence of the teacher as during her absence." 300 N. Y. at 309-10; 90 N.E.2d at 475.

In *Guyten v. Rhodes,* 65 Ohio App. 163, 29 N.E.2d 444 (1940), the 12 year old plaintiff, a student at a school for defectives and incorrigibles, was struck in the eye with a milk bottle thrown by a fellow student while the teacher was absent from the classroom. The plaintiff's petition, which had been dismissed on demurrer, alleged that the student who threw the bottle was 17, was "of a violent and vicious nature, incorrigible" and had made previous attacks on the plaintiff, which were known to the teacher.

In affirming the sustaining of the demurrer, the Ohio Court of Appeals said:

> "Suppose the assault had occurred when the teacher was present. There is nothing alleged to show that it would not have so occurred. It is necessary in order to constitute the absence of the teacher the proximate cause of the plaintiff's injury that it be reasonably inferred that had the teacher been present, such assault would not have occurred. A jury would not have been justified in so concluding.
>
> * * *
>
> "The mere statement that an act or neglect is the proximate cause of an alleged injury is a conclusion of law, unless the relationship is so apparent as to be reasonably inferable.
>
> "No such situation here appears. On the contrary, the violent disposition of the pupil assaulting the plaintiff appears to be the direct and proximate cause of the plaintiff's injury and the absence of the defendant only a remote cause, if any, requiring the employment of conjecture to sustain any connection between the absence and the injury." 65 Ohio App. at 165-66, 29 N.E.2d at 445-46.

The Ohio court's language is reminiscent of our own. In *Holler v. Lowery*, 175 Md. 149 at 161, 200 A. 353 (1938) our predecessors said:

> "There is no mystery in the doctrine of proximate cause. It rests upon common sense rather than legal formula. Expressed in the simplest terms, it means that negligence is not actionable unless it, without the intervention of any independent factor, causes the harm complained of. It involves of course the idea of continuity, that the negligent act continuously extends through every event, fact, act, and occurrence

related to the tortious conduct of the defendant, and is itself the logical and natural cause of the injury complained of. In the statement of the doctrine an intervening cause means not a concurrent and contributing cause, but a superseding cause, which is itself the natural and logical cause of the harm."

For other cases holding that lack of supervision was not the proximate cause of the injury, see *Wilber v. City of Binghamton, supra,* 296 N. Y. 950, 73 N.E.2d 263 (1947) ; *Nestor v. City of New York,* 28 Misc. 2d 70, 211 N.Y.S.2d 975 (Sup. Ct. N. Y. 1961) ; *Conway v. Board of Education,* 11 Misc. 2d 162, 171 N.Y.S.2d 533 (Sup. Ct. N. Y. 1958) ; *Wright v. City of San Bernardino High School Dist.,* 121 Cal.App.2d 342, 263 P. 2d 25 (D.C.A. Calif. 1953) ; *Taylor v. Kelvin,* 121 N.J.L. 142, 1 A. 2d 433 (Court of Errors & Appeals 1938).

A possibly contrary result reached in *Cirillo v. City of Milwaukee,* 34 Wis. 2d 705, 150 N.W.2d 460 (1967) must, in our opinion, be viewed in the light of the circumstances of that case. Sherry, a physical education instructor, left a gymnasium in which 49 boys 14 to 16 years of age were shooting baskets with basketballs for 25 minutes. The activity deteriorated into a "roughhouse game," and Cirillo, a student, was injured when he was pushed by a classmate. On appeal from the granting of the defendant's motion for summary judgment, the Supreme Court of Wisconsin reversed, holding that "rowdyism" should have been foreseen by Sherry, and that apportionment of negligence which flowed from Sherry's absence was a jury question under Wisconsin's comparative negligence statute, and could not be resolved on summary judgment.

*Luce v. Board of Education,* 3 N.Y.2d 792, 143 N.E.2d 797 (1957), *aff'g* 2 A.D.2d 502, 157 N.Y.S.2d 123 (1956) relied on by the appellee, is inapposite here. The holding of that case was that whether a physical education teacher had used reasonable care was a jury question

when the evidence showed that the teacher who knew that the infant plaintiff had suffered two fractures of her right forearm and that the child's mother had requested that she not be permitted to participate in "rough games," had allowed the child to play "jump the stick relay," a vigorous game in which she was injured.

There are, however, some cases which might offer a plaintiff comfort. *Hoose v. Drumm*, 281 N. Y. 54, 22 N.E.2d 233 (1939) and *Miller v. Board of Education*, 291 N. Y. 25, 50 N.E.2d 529 (1943) are playground cases, where suits were brought against the school districts alleging that there was inadequate supervision. Both denied recovery against the school district but implied that recovery might have been had against the teacher, had the plaintiff joined a teacher as a defendant in *Hoose*, or had the plaintiff in *Miller* moved for a directed verdict against the teacher. In *Gardner v. State*, 256 A. D. 385, 10 N.Y.S.2d 274, *aff'd* 281 N. Y. 212, 22 N.E.2d 344 (1939), an 11 year old girl was permitted to recover for injuries incurred when she attempted a hand stand, on a finding that a failure to instruct on the proper method of performance of the activity was the proximate cause of the injury. In the instant case, however, there is ample evidence that the children had been taught the correct manner in which to perform push-ups.

The appellee has referred us to a group of cases which are not especially helpful. *Bauer v. Board of Education*, 285 A. D. 1148, 140 N.Y.S.2d 167 (1955) imposed liability on the Board of Education for injury to a student who was hurt while playing basketball in a high school gymnasium which contained eight contiguous or overlapping basketball courts, all of which were used simultaneously. *Feuerstein v. Board of Education, supra*, 202 N.Y.S.2d 524 (Sup. Ct. N. Y. 1960) held the Board of Education liable in damages to a pallid and frail 14 year old student who suffered a myocardial infarction as a result of being asked to carry packages of supplies and books, some weighing as much as 65 pounds.

*Kaufman v. City of New York*, 30 Misc. 2d 285, 214

N.Y.S.2d 767 (Sup. Ct. N. Y. 1961) and *Meyer v. Board of Education,* 9 N. J. 46, 86 A. 2d 761 (1952) are the least helpful of all. In *Kaufman,* suit was brought by the administrator of a 19 year old boy who died as a result of head injuries sustained while playing basketball at Brooklyn College. The court rejected the contention that the Board of Education was negligent in failing properly to supervise the game. The court quoted from *Ohman v. Board of Education, supra,* 300 N. Y. 306, 310, "This is one of those events which could occur equally as well in the presence of the teacher as during her absence" and added, 30 Misc. 2d at 286, 214 N.Y.S.2d at 769, "If it may be said that the absence of a supervisor or instructor, under the circumstances, was negligence, still such lack of supervision was not the proximate cause of the accident," citing *Frazier v. Young Men's Christian Ass'n of Little Falls,* 286 A. D. 464, 144 N.Y.S.2d 448 (1955), *aff'd* 1 N.Y.2d 904, 136 N.E.2d 908, 154 N.Y.S.2d 963 (1956) to the same effect.

In *Meyer,* suit was brought against the Board of Education and a teacher in behalf of a 16 year old boy whose finger was caught in the belt drive mechanism of a power jig saw in a manual training class. There was testimony that the plaintiff was cleaning the saw when a classmate turned on the electric switch. The teacher was in the room, but 40 feet from the scene. The court, relying on *Taylor v. Kelvin, supra,* 121 N.J.L. 142, 1 A. 2d 433, which found that the proximate cause of the plaintiff's crushed finger was the movement of a printing press fly wheel by a fellow student, held that the throwing of the switch "was such an independent intervening cause' as to break the chain of causation between the accident and the oversight of duty * * *. The act of the fellow pupil was the sole proximate cause of the injury." 9 N. J. at 49-50, 86 A. 2d at 762.

If a rule can be developed from the teacher liability cases, it is this: a teacher's absence from the classroom, or failure properly to supervise students' activities, is

not likely to give rise to a cause of action for injury to a student, unless under all the circumstances the possibility of injury is reasonably foreseeable. In *Carroll v. Fitzimmons*, 153 Colo. 1, 3, 384 P. 2d 81, 82 (1963), the Supreme Court of Colorado had before it the question whether an allegation "that the plaintiff was struck in the eye by a rock thrown by a fellow student" and "* * * that the defendant teacher permitted the rock to be thrown" stated a cause of action. In affirming the dismissal of the complaint, the court quoted from *Nestor v. City of New York, supra,* 28 Misc. 2d 70 at 71, 211 N.Y.S.2d 975 at 977:

> "There is no requirement that the teacher have under constant and unremitting scrutiny the precise spots wherein every phase of play activity is being pursued; nor is there compulsion that general supervision be continuous and direct."

The point is that a teacher could be liable to an injured student, whether or not the teacher could have prevented the injury, if the injury is a reasonably foreseeable consequence of absence or failure to supervise. Under such circumstances, the intervening force does not become a superseding cause which breaks the chain of causation, but becomes a part of the original tort. Prosser, *Torts* § 51 (3d ed. 1964) at 309; Restatement, *Torts* 2d §§ 440, 441, 447 (1965).

In *Ferreira v. Sanchez,* 79 N. M. 768, 449 P. 2d 784 (1969), Ferreira, a high school student, was participating in a play in which a blank cartridge was to be fired. Just prior to the last performance of the play, another student substituted a live cartridge and shot Ferreira. In an action in which the principal of the school and the teacher directing the play were joined as defendants with the student who fired the gun, a finding that the injury resulted from a superseding cause was affirmed. See also, *Luna v. Needles Elementary School*

*Dist., supra,* 154 Cal. App. 2d 803 at 807-08, 316 P. 2d 773 at 776: "There is no evidence that would justify the inference that this teacher should reasonably have expected not only that this boy would climb this wall but that his hand would slip at the very moment another boy was moving the gate."

The test of foreseeability was well stated in *McLeod v. Grant County School Dist.,* 42 Wash. 2d 316, 255 P. 2d 360 (1953), a case which held the school district answerable in damages to a girl who was attacked in an unlighted room adjacent to the school gymnasium. There the Court said:

> "* * * Whether foreseeability is being considered from the standpoint of negligence or proximate cause, the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated. [citing case]." 42 Wash. 2d at 321, 255 P. 2d at 363

having previously said:

> "The harm which came to appellant was not caused by the direct act or omission of the school district, but by the intervening act of third persons. The fact that the danger stems from such an intervening act, however, does not of itself exonerate a defendant from negligence. If, under the assumed facts, such intervening force is reasonably foreseeable, a finding of negligence may be predicated thereon. [citing case]." 42 Wash. 2d at 320, 255 P. 2d at 362.

Substantially the same rule was formulated by Judge Adkins, speaking for this Court in *State ex rel. Schiller v. Hecht Co.,* 165 Md. 415 at 422, 169 A. 311 (1933):

> "If the negligent acts of two or more persons,

all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another. [citing cases]."

To the same effect is the language in *Bloom v. Good Humor Ice Cream Co.*, 179 Md. 384 at 387, 18 A. 2d 592 (1941):

"Variously stated, the universally accepted rule as to the proximate cause is that, unless an act, or omission of a duty, or both, are the direct and continuing cause of an injury, recovery will not be allowed. The negligent acts must continue through every event and occurrence, and itself be the natural and logical cause of the injury. It must be the natural and probable consequence of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability. [citing cases]."

If we apply this test to the facts of the case before us, it would be difficult to say that Mrs. Segerman could be held to have reasonably anticipated that any injury

would result, whether the class performed the exercises while she was present in the room or after she had left it.

The testimony was uncontroverted that the members of the class had done push-ups before, possibly for as long as a year, in their physical education classes. She took the precaution of playing the record the first time with the children in their seats. She then spaced the children in the classroom and there is no testimony which would lead to the conclusion that this was done improperly. She then played one side of the record and observed the children doing the exercises before she left the room. She had no reason to apprehend that any of the children would leave his assigned place or that any of the children would perform the exercises improperly, least of all Bobby Glaser, who, according to the testimony, was a good athlete. The intervening force which became a superseding cause was the fact that Bobby chose to move from the place which had been assigned to him, and once there elected to do the push-ups by resting his knees on the floor rather than by supporting himself with the tips of his toes. If he had not changed his position or if he had changed his position and kept his toes on the floor, Mary would never have been hurt. To say that Bobby's acts should have been foreseen by Mrs. Segerman would be sheer conjecture. Although foreseeability is usually a jury question, *Little v. Woodall*, 244 Md. 620, 224 A. 2d 852 (1966), a jury should not be permitted to engage in speculation, *Industrial Service Co. v. State ex rel. Bryant*, 176 Md. 625, 6 A. 2d 372 (1939). As the Supreme Court of Arizona said in *Morris v. Ortiz*, 103 Ariz. 119, 437 P. 2d 652, 654 (1968), which held that a teacher could not be held responsible for the injury sustained by a student while working on an automobile in a school shop, when a fellow student jumped onto the car:

> "Such gossamer speculation is the stuff from which dreams are made and not the foundation stone for an action in negligence."

The Court concluded that the defendant teacher could not have foreseen that the student would jump and that this would result in plaintiff's injury.

While proximate cause is ordinarily a question of fact, it becomes a question of law in cases where reasoning minds cannot differ, *Gosnell v. Baltimore & Ohio R.R. Co.,* 189 Md. 677, 57 A. 2d 322 (1948), or where uncontroverted evidence establishes an efficient intervening cause, *Baltimore Transit Co. v. Worth,* 188 Md. 119, 52 A. 2d 249, 5 A.L.R.2d 740 (1947). For other cases on foreseeability, compare *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 235 A. 2d 556 (1967) with *Haynes v. American Cas. Co.,* 228 Md. 394, 179 A. 2d 900 (1962), and see *Parsons v. C. & P. Telephone Co.,* 181 Md. 502, 30 A. 2d 788 (1943) and *State of Maryland ex rel. Pumphrey v. Manor Real Estate & Trust Co.,* 176 F. 2d 414 (4th Cir. 1949). See also, Note, *Foreseeable Intervening Negligence Not a Superseding Cause,* 21 Md. L. Rev. 68 (1961).

*Judgments reversed, costs to be paid by appellee.*