GERALDINE POKEY COLLINS, Individually, etc. v.
THE BOARD OF EDUCATION OF KENT COUNTY

[No. 807, September Term, 1980.]

*Decided March 9, 1981.*

The cause was argued before THOMPSON, MELVIN and WILNER, JJ.

*David M. Williams* for appellants.

*E. Dale Adkins, III,* with whom were *Anderson, Coe & King* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

When, on April 23, 1979, sixteen-year old Oscar Grinnell decided to ride home from school with his friend and fellow student Jimmy Styons rather than take the school bus, he made a tragic mistake. Jimmy was involved in a head-on collision when he attempted, improperly, to pass a school bus, and Oscar was seriously injured in the crash.

Oscar's mother, appellant here, sought recompense for her son's injuries; but in the judgment of the Circuit Court for Kent County, she has sought it from the wrong person. She sued the county board of education on a most novel theory. By sustaining the board's demurrer, however, the court indicated its unwillingness to adopt that theory; and we think its position was a correct one.

Appellant's First Amended Declaration, to which the demurrer in question responded, contained three operative counts, each proposing a different sub-theory of recovery. It was alleged, in an introductory part of the complaint, that (1) Oscar was properly enrolled at the Kent County High School, a "consolidated" school operated by the board; (2) as the school was more than a mile from Oscar's home, the board had a statutory responsibility (Education article, § 4-119) to transport Oscar to and from the school; (3) school board rules and regulations required Oscar to ride the school bus; (4) Oscar rode the bus to school that morning; (5) appellant rightfully expected that Oscar would be "safely returned to her custody, safety, supervision and control at the place where he boarded said school bus in the morning"; and (6) the board "negligently breach[ed] its numerous duties owed to [appellant] to arrange for safe transportation home for [Oscar]" for the reasons set forth in the three ensuing counts.

Count A complained that the board negligently violated its duty under Education article, § 4-119 when it "knowingly and negligently permitted" Oscar to get into a vehicle with Jimmy Styons without appellant's permission, knowing that such form of transportation was unauthorized and with "knowledge from which it should have been known

that the student [Oscar] foreseeably was riding home from school in a vehicle being driven by a student who was one of a number of students that habitually drove home from school in a speedy, reckless, hazardous and unsafe manner or would probably drive home from school in the aforesaid negligent fashion. . . ." Thus, said appellant, the board violated its duty to provide Oscar with safe transportation.

Count B repeated everything alleged in Count A, and asserted as a purportedly distinct cause of action, a violation by the board of its duty to enforce its bylaws, rules, regulations, and policies pursuant to § 4-107 of the Education article. The bylaws, etc. allegedly violated were those "relating to permits for student driving and parking privileges," although the Amended Declaration did not specify what particular bylaw, rule, regulation, or policy was transgressed.

Count C also repeated everything alleged in Count A and, in somewhat of an antithesis to Count B, charged that the board had negligently failed to adopt rules, regulations, and policies to assure that students dutifully got on their designated buses, and that they did not ride in private vehicles without their parents' permission.

Finally, in a concluding statement that, grammatically, seemed to be a part of Count C but perhaps was intended to apply to all three counts, it was alleged that the board, with the exercise of ordinary care, knew or should have foreseen that an accident would occur, and that the injuries resulting to Oscar were the "direct and proximate result" of the board's negligence.

After hearing argument, the court sustained the board's demurrer to Counts A and C without leave to amend, concluding, respectively, that § 4-119 does not impose the type of duty alleged by appellant and that there was no legal requirement for the board to adopt regulations prohibiting a student from riding home in a private automobile without his parent's permission. The court also sustained the demurrer to Count B, but offered leave to amend if appellant could properly allege that an agent of the board responsible for regulating student departures had actual knowledge that

Jimmy Styons was a reckless driver, and could have prevented Oscar from leaving with him. Appellant responded that she was unable to make such an allegation, whereupon the court sustained the demurrer to Count B without further leave to amend.

Appellant does not complain here about the court's declination of further leave to amend. The question is whether, upon the Amended Declaration as it stands, she has stated a cause of action.

As the case reaches us, procedurally, upon the sustaining of a demurrer, we must, in looking at the Amended Declaration, assume the truth of all *facts* well pleaded. The question before us is not one of fact, however, but one of law. In short, did the county board of education have a legal responsibility to make certain that Oscar got on his designated school bus; did it have a legal responsibility to prevent him from securing alternate means of transportation, specifically with Jimmy Styons; and is it answerable in damages if it had those responsibilities and did not properly discharge them?

We start with Count A and § 4-119.[1] That section provides (1) "[i]f a county board considers it practicable, it shall consolidate schools," and (2) "[s]ubject to the approval of the State Superintendent [of Schools], each county board shall arrange for the transportation of students to and from consolidated schools."

Section 4-119 ultimately derives from Acts of 1904, ch. 584. At that time, the counties were subdivided into school districts. One of the principal functions of the county school commissioners, the forerunners of the county boards of education, was to set, and alter, the boundaries of those districts and to select suitable sites within the various districts for the erection of schools. There was no specific statutory direc-

---

1. There are a number of other provisions in the Education article dealing with the transportation of students, but they have not been mentioned or relied upon by appellant, and we therefore shall not consider them. *See, for example,* §§ 5-201 (c) and 2-205 (j) dealing with State financing of transportation costs, § 7-601 authorizing county boards to provide additional transportation services, and § 8-412 providing for the transportation of handicapped children.

tion as to the consolidation of schools, although the power to consolidate would seem to have been implicit. *See, for example,* Acts of 1872, ch. 377, ch. IV-VI. The 1904 Act which rewrote a good bit of the State education article, authorized the county school commissioners "to consolidate schools when, in their judgment, consolidation is practicable and desirable, and to arrange for and pay charges of transporting pupils to and from such schools."

In 1916, this authorization became a direction. By Acts of 1916, ch. 506, the next major recodification of the education laws, the General Assembly provided that the county board "shall consolidate schools wherever in their judgment it is practicable, and arrange, when possible without charge to the county, and shall pay, when necessary, for the transportation of pupils to and from such consolidated schools." The direction to consolidate schools was, of course, reflective of the public policy that the little one-room red schoolhouses reminiscent of the education of young Abe Lincoln were becoming dysfunctional, and that larger, more centrally located schools serving a wider "catchment" area were desirable. The need to provide transportation for the children required to attend the consolidated schools was a natural by-product of that centralization. As the Court of Appeals said of that provision in *Adams v. County Commissioners of St. Mary's County,* 180 Md. 550, 555 (1942), it was "obviously passed to meet a need arising from removal, in the consolidation, of schools from the former local neighborhoods and the consequent increase of distance to be traveled by some children."

The provision, as enacted in 1916, survived the 1969 rewriting of article 77 and, with but inconsequential style changes, the 1978 recodification that produced the Education article.

There is nothing in the plain wording of § 4-119, much less in its legislative history and purpose, to suggest the connotation sought to be placed on the statute by appellant. The board is required to "arrange for the transportation of students"; and, from what is alleged in the Amended Declaration, it has done so by providing school buses. By making

a school bus *available,* it gave Oscar the means of getting to and from school; and that is all it was required to do under § 4-119. The statute does not make the means arranged by the board the exclusive mode of travel for each pupil eligible for the public transportation, and it certainly does not of itself impose any obligation on the board to assure that the students — particularly high school students — use the means provided by the board.

Count B, as noted, charged a failure by the board to enforce its regulations pertaining to permits for student driving and parking privileges. Those regulations were not specified in the Amended Declaration, but, upon demand by appellee, a document entitled "Kent County High School Student Parking Policy" was sought to be added as part of the Amended Declaration. Assuming (without deciding) that the provisions of the student parking policy could be so incorporated into the pleading, there is still absent any allegation of what policy was violated. We see nothing in the "Student Parking Policy" that prohibits a student from riding home with a friend or that requires school officials to compel the student to ride the school bus; and, to the extent that it might be relevant, there is no allegation that, at the time Oscar left, his friend Styons was in violation of the Student Parking Policy.

What seemed to concern the court with respect to Count B was the common law duty that school authorities have, as the temporary custodians of children, to exercise reasonable care for their protection (which is a matter quite different from any alleged violation of student parking regulations). *See, in general, Lunsford v. Board of Education of Prince George's County,* 280 Md. 665 (1977). But absent the type of more particular allegations that the court indicated it would accept — that the school officials had reason to know that Styons was a careless driver and that they could have prevented Oscar from riding with him — there is simply no breach of duty alleged from which damages can flow. Guilt by association or inclusion in a class has its limits; knowledge that some students are reckless does not imply knowledge that all students are reckless, or that Jimmy Styons in

particular was reckless. *Compare, for example, Hanson v. Reedley Joint Union High School District,* 111 P.2d 415 (Cal. App. 1941); and *cf. Segerman v. Jones,* 256 Md. 109 (1969).

Count C, as noted, charged a failure to adopt regulations of a sort that, in appellant's view, may have allowed this tragic accident to be averted. But we can find nothing in the law that placed any duty upon the county board to adopt the type of regulations suggested by appellant; and we therefore can find no liability on its part for not having done so.

*Judgment affirmed; appellant to pay the costs.*